Comcast Cable. Mr. Garrison. Good morning. May it please the Court. I would like to have some time to address the 832 patent, but we've received the communication from the Court asking us to be ready to address the Nozomi case. I thought I would start with that. Nozomi relates to a situation in which a product was sold and then end users could or could not put optionally different types of software on it to perform different functions. Nozomi turned on the fact that the Giselle software in question, there was no proof that the end users, equipment, and using it for that optional purpose. Our case is different. The connection systems and particularly the flash wave as example systems that were used by Comcast in its networks were shown at trial to actually perform the grooming function. I didn't read the testimony that way. I read the testimony of your expert as saying that a particular piece of equipment could provide the connectivity. I didn't see testimony that the system could work that way without modification. That testimony relates to what the manuals show the system is capable of doing. The system or the piece of equipment? The piece of equipment in the Comcast system. But isn't there a difference between the piece of equipment and the system? There is. There are different pieces of the architecture for how Comcast was using this in its sonnet networks, these flash wave pieces of equipment. There are also things called digital cross connect systems and also direct cabling. So it's not as though they could sort of flip a switch and the system would function differently. No, this is the core functionality of the thing. You don't buy it if you're not going to use it in that fashion. That was what Dr. Wilner testified to. He said, I don't understand why you would buy this system to begin with, this piece of equipment, if you will, if you're not going to use it in the manner that's set forth in the manuals. It's not sort of an additional add-on functionality that you can sort of optionally use or not use. Based on the trial exhibits that were entered, there was evidence of how Comcast actually used these materials in its network. This is at Appendix 74, 73, through 75, 79. Two pieces of evidence. One is a deposition exhibit that Comcast 30B6 witnessed on the use of this equipment in Comcast networks used, and the other is an interrogatory response, which showed how for each network the pieces of the architecture were operating with each other. Okay, what were those pages, please? Appendix 74, 73. What volume are we talking about? I believe it's volume three. Can you say the numbers again, please? Certainly, I'm sorry. Appendix 74, 73 through 75, 19 is one of the items. The other item is Appendix 75, 20 through 75, 79. But those are gigantic documents. Can you focus on, at least for me, the Portland-San Juan cross-connect or some sort of connect system and the difference between configured and actual use? I want to stipulate at the moment for purposes of this question that the district court, in focusing on actual operation, departed from the actual requirement of configured. What is the testimony that the, I think it's a Cisco system in those? It's called a DCS cross-connect. Right, but a Cisco version of it, right? Yes, I believe that's right. Right, 15454 or something? Yeah. So for Portland, to give you an example, it's an Appendix 14862. There's a specific I think it's called... What volume is that in? 14862. Volume? I believe that one is in Volume 2 of the Appendix, but it could be... 14862 is the last volume. Is the last volume. And what that is, is it shows that the same Tell Labs, this is a Tell Labs system, is present in both for Vancouver and Beaverton. It's the same piece of equipment. Yeah, but that doesn't show system capability as opposed to device capability. Well, the device is what, within the system, provides that capability. You configured to manipulate the SONET traffic. In its interrogatory response, in the larger materials that I cited to you, Comcast identified that this particular traffic running over this equipment is SONET traffic, and that this shared equipment here is what is performing the claim elements.  Yeah, but the problem is this technology is complex. I don't think the briefs did a great job of explaining it to us. And what you have to show is something, some testimony in here, some evidence that the system had this capability. And I'm not seeing that, because I can't make the connection between a particular piece of equipment having the capability and the system having the capability. Well, there were three areas that we showed at trial that for the various networks these things were happening, through direct connections, through DCS, and something called switching functionality in the flash wave equipment. And for the switching functionality, we did the whole purpose of this equipment is to provide that switching functionality. That's the core purpose of it. It's not an optional software add-on. It is the whole reason that the piece of equipment exists. If you're buying it and you're using it in your network, then it is expected to carry forth the basic core purpose for what you're purchasing. And that was Dr. Wilner's testimony. No, it isn't his testimony. He doesn't say that about the system. He says that about the particular piece of equipment. But that is the piece of equipment which performs that function in the system. And that was Dr. Wilner's testimony at trial. Can I just focus you on, I think, at least as I'm understanding it, is one segment of the arguments you're making. You've got arguments about the ring terminal, and I want to put aside everything for the moment except Portland and San Francisco, and focus just on those two locations, and just on the connection issue. And that has to do with this, as I understand it, the Cisco 15454, and the district court granted JMOL on that piece by saying you didn't show that the systems actually operated in accordance with the claim requirement. Notwithstanding a claim construction requirement, only that they be configured to do so. So what I want you to try to tell me is, what is the testimony, and configured is different from, here's a piece of equipment that if you added new software or reprogrammed could do it, it has to actually be more or less subject to the flip of a switch to make it do it, even if it's not in fact doing it. So what is the evidence for the proposition that it is configured to do this, even if there's no evidence that it is actually doing it? The evidence is, we cite it, there's a great deal of evidence at pages 55 through 60 of our opposition, of our opening brief. But it is Dr. Wilner's experience in using this information, using this type of equipment, seeing from the interrogatory response, and this interrogatory response and the exhibit, the deposition exhibit, are very big pieces of material, but within them they each focus down on each of the regional networks and describe exactly what the pieces of the architecture are. And that is the evidence that we're relying on, Dr. Wilner's experience, and that information from the Comcast interrogatory response and the deposition exhibit. I, if I may, reserve time at this point. Do you want to say anything about the 832? I do, I absolutely do. I believe that the District Court's summary judgment was an error. The District Court did not look properly at what the inventive entity was. The Kaplan reference is not prior art under 102E. I see, with respect to another question, I see testimony that the inventors of the 832 worked on these prototypes. Perhaps there's testimony that the prototypes embodied the 832 invention, but I also see that testimony as saying that the 832 inventors worked with other people in developing those prototypes. So there isn't testimony that the 832 inventors were responsible for the aspect of the prototypes that supposedly embodied the 832 invention. Well, the 832, I think in the Bernat Declaration, which is A2007, and the Bowe-Bogg testimony does address that point. There's a difference between the inventive... No, it doesn't address that point, because all the testimony that I've seen, and maybe you can show me other testimony, the testimony that I've seen is that the 832 inventors worked with other people in developing these prototypes. And there isn't any testimony that the 832 inventors were the ones who were responsible for this aspect of the prototypes. The other people that they worked with were the other people on the Kaplan reference. There's a difference between what's in the disclosure of Kaplan and what's in the claims in terms of naming inventive entities and inventors on the two separate patents. In fact, there's no evidence that they did not collaborate in that way. The 832 inventors were focused on that. That doesn't do it. The 832... You've got to have evidence that the 832 inventors were the ones who developed the aspect of the prototypes which supposedly embodied the 832 invention. And I just don't see that testimony. The different inventors in the testimony that we cited in the briefs talked about their patent that describes the entire thing on both the system side or the network side, and what's called the home or provider side, provider agent. The 832 patent is focused on the home side of that. And I believe that the deposition testimony does show that Mr. Boe, Mr. Bog, as it shows in the briefing, was one of the people that overlapped between those, between those two teams, but it was the 832 inventors as reflected by the selection of inventive entities on the 832 patent itself. And when you look at the claims that they worked on that aspect of things, it's reflected in the patent itself, in the inventive entities. As opposed to the Kaplan claims, which are broader, go to the entire thing, and thus name a different set of inventors, including Mr. Bog. Okay. Thank you, Mr. Garretson. We'll give you three minutes for your rebuttal. Thank you. Mr. Lear. May it please the Court, good morning, Your Honors. Matthew Lear of Davis Polk & Wardwell for Comcast. Let me start off with the sonnet issue. This is testimony from Dr. Wilner at the trial. And this appears at page 4, 5, 6, 5 of the appendix. I asked Dr. Wilner, Dr. Wilner, you have no idea how those flash waves in any single facility you identified today are actually operated in real life. Answer, how they're actually operating, question yes. Answer, I do not know. Right. So, but that's not the standard. The standard is how they're configured to operate. So that suggested, and I think the district court bought the idea that those are equivalent, but they're not. So what is the evidence that they're not configured to do it? Well, Your Honor, these... does not support JMOL. Your Honor, the flash wave devices, which were used as exemplary devices, the Flash Wave 4300 and the Flash Wave 4500 have... Sprint has cited essentially to the entire manuals. Those manuals describe how various cards can be plugged in and not plugged in, and how, for example, grooming can take place at various levels. One of the claims here requires grooming at both the STS levels. Can you focus for me? The thing that I'm interested in is Portland and San Francisco, which was not based on the grooming add-drop multiplexing. It was based on this connection piece of the claim requirement. And the district court, tell me if I'm wrong in remembering, said the problem there is that there's no evidence that they actually operate to perform this connection, which is not required by a configuration construction. They don't have to actually operate. All they have to do is be configured to operate. So the question is, was there sufficient evidence for a jury to find that they are so configured, even if they never actually do operate that? Respectfully, I don't believe so, Your Honor, because what, and you heard this from Mr. Gerretsen today, what Wilner testified was, I look at the manuals, I'm experienced in these optical networks, I believe that somebody would configure these flash waves and these Cisco devices to operate in a specific way. There is no... I'm not remembering those words. I'm remembering his words that say, two or three times, they allow this to happen. Allow sort of suggests maybe configured. And then the other thing is, why would somebody have it if they're not using it? Which is a point about how he thinks they probably are actually using them for that. Neither one of which is contrary to they are configured. But they never proved the first point, Your Honor. They never proved that they were in fact configured. Were you listening earlier about the difference between the equipment and the system? Yes, Your Honor. Does this make sense? I mean, perhaps he testified that the equipment could provide connectivity of the type that's required by the clients, but he didn't testify that the system was configured that way. I think that's a fair distinction, Your Honor. I mean, what Wilner... Wilner never examined any individual facility. He had no idea how these operated in real life as I've just shown in his testimony. His basic theory was, if you look at these sonic connection systems that Comcast has, I as somebody experienced in the art would believe that you would configure a system to operate these OC12 cards. I don't see that he testified to that. Where did he testify to that? I'm saying that is at most what he could say, Your Honor. What did he actually say? My recollection, and that may be mistaken, is that he testified only about the particular piece of equipment. He said that the equipment would have this capability, and he suggested, you know, why would you buy it if you didn't want it potentially to have that particular configuration? Fair enough, Your Honor. That's exactly right. He focused on the individual flash wave systems, put the manuals up, and said, I look at these manuals, and I believe that somebody would configure something in this flash wave to achieve this end. That was basically his testimony. Can I move to ring terminal just for a second, Your Honors? Unless there's a... So, the issue that I think Sprint is still arguing on this appeal, even though they say they're not, is the single card theory, because the claims require unique ring terminals. And they require unique ring terminals to perform the functions of add, drop, muxing, grooming, switching, sending, and receiving. And, for example, they say in the reply brief, that there was testimony from one of the Comcast Chicago employees, and this is at the reply 18, and they say, there's testimony in the record that these individual cards are capable of grooming. And they cite to this testimony where our witness, this is at page 4835 of the record, where a Comcast witness said that the interface card provides multiplexing and demultiplexing,  but add, drop is performed by the switch fabric. And then the following question, the witness says, that in fact, these cards cannot perform grooming specifically unless they use a switch fabric. So the case really met on whether or not the cards could be unique ring terminals when it's crystal clear from the manuals that Dr. Willner relied on, that the switch fabric is mandatory in every instance. You cannot communicate from one OC12 card to another OC12 card, to communicate traffic across the spans as required by the sonic claims, unless you use a switch fabric. And it's indisputable that the switch fabric is common. So what, the theory has changed over and over and over again, but it seems to me that the theory today as it stands is Sprint says, two OC12 cards, for example, in a Flashway 4500 in tandem, can communicate traffic across the spans, but the uniqueness is in the individual cards. It's back to the single card theory. And the testimony in the manuals are that an individual card cannot add, drop, mux, cannot groom, and most definitely cannot switch, because that is what the switch fabric is for. So our position is that they basically reverted to the single card theory, and it just doesn't stand up to what the evidence shows about what these devices do. So let me turn briefly to... Switch fabric is common, right? Yes, Your Honor. And the manuals, let me give you the exact page, at appendix 10059. This is for the Flashway 4300. It says at the top that this plug-in unit is mandatory for all Flashway 4300s. There's not even a question about this. Can I ask you, supposing that the argument about switch fabric and therefore the ring terminals can't be either individual card or even possibly two cards if they're going to be unique and so on, my understanding, my recollection of the district court's opinion, is that that covers everything except Portland and San Francisco. Is that right? Portland and San Francisco and Seattle. Yeah, but with Seattle he said it's one thing or the other, so that effectively covers that, right? Yes. So for Portland and San Francisco, what you were just talking about, you haven't yet discussed that. No. That's about the connection system, and my understanding of that is that the issue on which that piece turns is whether the systems there are configured to, what is it, make certain connections? Yes, Your Honor. Connection for grooming or something. And on that, my recollection, just sort of going back to where I started, is that the district court said the element is not required because there's no evidence that they actually operate to do that. That seems to me an insufficient reason to conclude that they're not configured to do so. So what is, now this is going to be a new argument on your part, one that Judge Andrews did not articulate, what is the reason to conclude that there's no evidence that the system is configured, again, just for Portland and San Francisco, just on the connect piece, to do what's required? Your Honor, I think our position is they didn't meet their burden of proof to show even that level, even the level that they were configured to. Even though Wilner expressly said it, and the only supposedly, you know, killer contrary colloquy was your colloquy with Wilner about what they actually do, which doesn't go to what they're configured to do. Again, Your Honor, I think that what Wilner was saying, and I don't have the exact testimony in my fingers, but I think what Wilner was saying is, I believe, based on my experience about how people use these devices... You asked him questions completely focused on what they actually do. And so he responded to those questions by saying, I think they do it. What I keep focusing on is that's not the inquiry. Of course he was going to respond to you in the terms that you asked, but those are not the terms required. Fair enough, Your Honor. And what I'm saying is I don't think that Sprint met its burden to even show configured to. Wilner can't just say, I believe they're configured to. I mean, these systems can be configured in multitudes of ways. I mean, that's the whole point of these large devices. You can have... You can switch, for example, at the VT level. I'm sorry, you can groom at the VT level, or you can not groom at the VT level. He had no... There was no specific evidence... VT? Virtual tributary, Your Honor. I'm sorry. If you look in the first claim that's at issue, that's still alive, Claim 7, it says that it has to be able to groom specifically at the STS level, which is one measure of sonnet traffic, and the VT level, which is yet a smaller unit of sonnet traffic. There's no evidence from Wilner that says, I looked at that specific device in San Francisco and determined that it was configured to groom traffic at the VT level. I don't know where that is in the record, Your Honor. Is there evidence from the manuals or otherwise that that capability requires some programming? Anything going the other way, as opposed to... It's there in what we send you out of... I don't know who makes these boxes. Most definitely, Your Honor, and forgive me, I don't have the exact page, but in the 4300 manual, for example, it discusses a number of different virtual tributary configurations that the owner can opt to use or not opt to use. So STS grooming is the common way that grooming is done and likely to... Is there a manual for the particular piece of equipment that he was testifying about? Yes, Your Honor. He testified broadly about two pieces of equipment, both of which were Fujitsu flashwave devices, the 4300 and the 4500. And those... I'm confused about that. I thought that was part of what he was testifying about, but for Portland and San Francisco, it was not the Fujitsu. It was these 550 NGXS things  That's correct, Your Honor. But again, I go back to... I don't see anything in the record where they say that device in Portland and San Francisco was configured to groom traffic at the VT level and specifically point to evidence where that happens because Willner was not... He didn't have those facts at his disposal. And in your JML motion, did you specifically say not only is there no evidence that they don't... There's no evidence that they actually operate, but there's no evidence that they're configured and no evidence that, in particular, they're configured at this specific level? Your Honor, I confess I don't recall, honestly, exactly how we argued that. I'm sorry. If I could take one minute on the 832 patent. It's tautological that Kaplan discloses what is claimed by the 832 patent. It's agreed that Kaplan anticipates 832. So the only issue is... Who thought it up? Either who thought it up, Your Honor, or who... One of their other positions is that the 832 inventors invented... They swore behind the inventive date of Kaplan and they built a prototype. And the evidence in the record, at best, is ambiguous about what prototype was built, who built it, what it did, and when they did it. The... Well, ambiguous evidence is not enough to grant summary judgment. It's ambiguous from interested parties, Your Honor. It's not just ambiguous. It's people who are either co-inventors on the 832 or the prosecuting attorney, Mr. Setter, who was a prosecuting attorney for Sprint. Don't we have... I mean, we have the testimony of the inventor or we have a declaration from the inventor or we have a testimony of the patent attorney that the 832 invention occurred prior to the Kaplan patent, which obviously requires corroboration, right? Yes. But then we have corroboration in the Kaplan patent itself that a demonstration occurred prior to the date. I disagree with that respectfully, Your Honor, for two reasons. Number one... Let me ask you this. I think... Maybe I overstated it.  I believe, Your Honor, it doesn't show that it occurred. Kaplan makes no reference to an actual device being prototyped and demonstrated. It's a patent application that says, we have an idea for a provider agent and a hub. There's nothing in Kaplan on its face that says, here are the results of a demonstration that occurred that we used to make this patent application. That's point one. And point two... No 339 inventor, including Mr. Bogg, testified that the 339 inventors didn't have some role in developing the provider agent and the communication hub. There's no evidence that the 339... I'm sorry, the Kaplan... There's two 339 pits. The Kaplan inventors didn't have a role in developing the provider agent and the communications hub. So it's circular to say that Kaplan provides corroboration both of prior invention... The general picture that at least I remember being presented with, and I don't remember... The question is, what is the particular evidence, is that Sprint had this fairly large project. The project had different components. The A32 team had this component. They worked together as a unit. You couldn't distinguish any of them. This piece of it clearly was conceived by somebody because it didn't spring into the Kaplan application with monkeys typing on typewriters and suddenly it appearing. It was conceived. The question is by who. Isn't there evidence that the way Sprint organized its big ION project had... The piece that is subject to 832 and referred to in Kaplan came from what? The group working on that piece of the project. That's what the 832 inventors say, like Bernath. That's what Setter says, although he's pretty ambiguous about it because his testimony was, I saw them messing around with equipment, etc. Wait, I don't recall any testimony that the 832 inventors were responsible for that aspect of the disclosure in Kaplan or that they worked on... That they, as opposed to other people, were responsible for that aspect of the supposed prototype. That's correct, Your Honor. There's no testimony that says from any 832 inventor that says I am responsible for what is in Kaplan. That's neither necessary nor what Judge Dyke said. The question is the inventive entity in 832. It's the group, right? Yes. Isn't the story that's the group that had that piece of the Sprint Ion project and there's no reason... And we together, I think Bogg said, I never did anything by myself. I'm indistinguishable from my 832 colleagues. We did this. No, I don't think that Bogg said that. I think that Bogg said that the 832 inventors working with other people did this. That is exactly right, Your Honor. He testified that the Kaplan people building the broader invention were focused on the broader invention and that the 832 inventors were working on the provider agent and the communications hub. But there's no testimony that says there weren't Kaplan inventors who were doing the same thing. The other point I would make, and I'm out of time, I realize, is the person who was best situated to determine who invented what was center. He testified. I was there. I was watching this. I wrote the cases. And he named a completely different set of inventors on Kaplan than on the 832 patent, with the exception of Bogg. Right, because they're claiming different things. Kaplan does not claim this piece. Isn't that some actual affirmative evidence that there is somebody missing from the Kaplan group responsible for the piece that's not claimed, or you would have had to include them in the Kaplan group? Your Honor, I don't recall off the top of my head what the originally filed claims were on Kaplan, but I don't know that there was a determination made when they named the inventors on Kaplan who would ultimately be... what the claims would ultimately look like that they could attribute back to the people that were named. All I'm suggesting is that Setter was sitting there saying this is the group that came up with what's disclosed in Kaplan, and that included the provider agent and the communications hub. I'm way out of time. Thank you. Okay. Thank you, Mr. Lerner. Mr. Gerretsen, you have three minutes. Thank you, Your Honors. Briefly, in response to the 832 patent first, there is the applied materials case that the disclosure in Kaplan obviously was conceived before it was in there, and that should mean that it is not properly a 102E reference. The inventive entity on the 832 patent itself, that the four people is... and when you look at the claims of the 832 patent, which were directed to the provider agent, and the in-home portion of the overall project that shows that it's those four people that were working on that. Also, Mr. Gerretsen... I think the testimony we're talking about is on 2521. Yes, Your Honor. On page 111. And this is, I guess, Bob's testimony. He says, all of these people that you've seen as co-inventors were involved at different levels. There were also people like the co-inventors of the 832 patent. But they were focused on more of the session manager and provider agent. But that doesn't say that they are the only people who did that, right? That does not by itself... that does not say that in so many words. When you look at all... when you look at the Burnett Declaration, the A2007, when you look at who was named as inventors on the 832 patent, when you look at the differences in the inventors on the Kaplan patent versus the 832 patent, when you look at Mr. Setter's testimony, parenthetically, the district court made a credibility determination with respect to Mr. Setter that we feel was inappropriate. That is not the sort of thing you do on summary judgment. But where is the testimony that the 832 inventors were themselves, not part of a larger group, were responsible for the 832 invention as disclosed in Kaplan? I think it's the fact that... we were focusing on testimony. Other than the testimony we've talked about, there is no testimony. But the naming of those people as inventors for the 832 claims, which Mr. Setter was responsible for the prosecution here, is in itself evidence of what those four people were targeted on. Very briefly, with respect to... the Portland and San Francisco, Your Honor, Judge Toronto, you had asked about the Portland and San Francisco evidence. If you look at page 58 of our opening brief, there are some specific figures and there are specific record citations for both Portland and San Francisco that show basically the same piece of equipment being used. And then with respect to the ring terminals... Mr. Laird, as I understood it, understood his response to one of my questions. Put aside the Fujitsu manual, which he referred to, but let's suppose that there's a similar manual for the other piece of equipment, Cisco or whatever it is, for Portland and San Francisco. I think he suggested that if you look at that manual, you can't tell that the thing that comes out of the box would be configured to serve this connection function. It might require some actual new software, some reprogramming. It's not just flicking a switch. What's the evidence on that? I don't think that that's borne out in the record. I don't recall that being a contested issue that their expert testified on. I do not have a record citation at my fingertips for that. But Dr. Wilner relied on, again, the interrogatory 10 and the deposition exhibit from their 30B6 witness who explained that this stuff was in the system and operating. Comcast also produced system manuals that reflected how these things worked. Dr. Wilner expressly relied on those as part of the trial record. So I don't have a specific point citation. System manuals as to how these things work? I say system manuals. The issue between system and equipment. For this particular piece, this DCS cross-connect, there is literature that comes with the product that was produced. The problem on that is that DCS can do a lot of different things, including the disputed function. But it doesn't have to do the disputed function, does it? I think it's part of its core functionality. It's a digital cross-connect system. It's in the name. It's the whole point of this piece of equipment. It is huge. But isn't it true it can do other things? I mean, isn't this the problem? Not to the exclusion. I'm sorry, Your Honor. You both did a really bad job in explaining this technology to us. And I have no idea what's going on. But it seems to me that it's unclear, or at least not clear enough to overturn, the fact that it doesn't necessarily show that this piece of equipment, even if its manual says you can do it, use it to do this, that when put in the system, it was configured to do that in this particular system. It's part of its core functionality. Whether or not it's – But you're not answering the question. I mean, you're assuming because you say it's part of its core functionality that when it was put in the system, it was automatically configured to do that. And I agree, it doesn't have to actually do that. It has to be configured to do that. But there's a difference between this piece of equipment being capable of doing something in isolation and then being configured to do it when put in the system. And what have you pointed to beyond the fact that this is its core functionality? Dr. Wilner's testimony that in his experience, when you look at the evidence that Comcast provided about how these pieces of equipment were actually being used in their networks, when you see the literature that they produced that shows their, I would say, core functionality, that when he looks at all of the information that Comcast provided and his experience based on his use of the systems, and this has to be the way that they are being used. I don't recall that testimony. I read the testimony. I think you're overstating what he said. I don't remember his using the terminology core functionality and I don't remember his saying that this is necessarily the way it would be used. He said that someone would buy this because it had the potential to do this. He didn't say that the only reason you would buy it would be to use it in this way. I think his testimony said that he wouldn't understand that you would have any other reason for buying it but then to use it. Where did he say that? I don't recall that testimony. I think that's the fair import of his testimony. Where did he say it? He said it was highly unlikely to work differently. This is Appendix 4561. Which volume is this? Lines four through eight. Which volume? Two. Two? Line two. 4561. Yes. This is where it says actually I'm highly confident that if you're going to buy a certain piece of equipment that it would be unusual, highly unusual to not, and this is I think the problem, to not have it potentially function that way. Well, there's also Mr. Raquel, their Comcast 30B6 witness regarding the DCS and the functionality of it at four, Appendix 4466, lines 11 through 21. 4466? 4466. This is their witness? Yes, this is their witness. None of these witnesses says that this is the core functionality of this piece of equipment, right? This is the purpose for which it's being used. Mr. Norman, who is the inventor. Where did somebody say this is the purpose for which it's being used? There's a difference between the way you're articulating this and the way the witness articulated it. We don't care what you're saying. What we care is what the witness said. Where does the witness say that this core functionality of this equipment is this and that that's the only way you would use it? He does not say it's the only way you can use it. He does not, there is no explicit testimony that it is impossible, that it is possible to use a DCS while disabling that core functionality that's talked about in the manual. In other words, the core functionality terminology doesn't appear here. That's your words. Understood, Your Honor. It was the material, when you look at the literature, the product literature that Comcast produced, this is what it talks about, this is what it does. This wasn't in a sub-addendum in chapter 72, additional things that you can do with this equipment. Where's the literature in the record that says this is the core functionality? These are the trial exhibits at the end of the joint appendix. There's a series of trial exhibits that show there are specific excerpts from the manuals for this equipment. That's where it is. Do you have at your fingertips the relevant manuals not for the Fujitsu devices but for the Portland, San Francisco? I keep thinking it's Cisco devices. Is that right or not? There's different pieces. There's Telab's pieces. I think there is a Cisco piece that you've referred to. The piece that Wilner was relying on putting aside the Fujitsu, he talked about those two, are the non-Fujitsu pieces for performing this cross-connect function. I do not have that citation at the tip of my tongue. I apologize. Okay. I think we're out of time. Thank you, Mr. Yaroslavsky. Thank you, Your Honor. Both counsel. The case is submitted.